**In re EMERALD OIL COMPANY, Debtor.**

**Bankruptcy No. 480–00233–LO. Adv. Nos. 480–0070, 482–0097 and 482–0101.**

United States Bankruptcy Court, W.D. Louisiana.

Sept. 19, 1985.

Gerald H. Schiff, Sandoz, Sandoz & Schiff, Opelousas, La., for trustee.

James R. Jeter, Cook, Yancy, King & Galloway, Shreveport, La., for Wheless Drilling Co., et. al.

Vance R. Andrus, Lafayette, La., for Mr. and Mrs. David S. Bennett.

W. Simmons Sandoz, Opelousas, La., Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RODNEY BERNARD, Jr., Chief Judge.

This matter has come before this court on a remand from the United States District Court (where this matter is styled "Wheless Drilling Company versus David S. Bennett, et al", Civil Action No. 84–1128). The three above-mentioned adversary proceedings, each of which was filed in the above-numbered case, are the subject of a proposed compromise agreement.

The first complaint was against David S. Bennett to avoid a fraudulent transfer as defined under Section 548 of the Bankruptcy Code. The trustee alleged that Emerald transferred its working interest in a group of mineral leases upon which the Williams B # 1 well had been drilled to David S. Bennett, an officer, director and stockholder of Emerald, in violation of Section 548.

The trustee's second complaint was against David S. Bennett to recover certain accounts receivable due by Mrs. Bennett to Emerald.

The third complaint was against David S. Bennett and Sam P. Bennett, the chief executive officer of Emerald, seeking to pierce the corporate veil. Pursuant to an application filed by the trustee to compromise the three adversary proceedings on February 16, 1983, this court held an evidentiary hearing for the purpose of ruling on the compromises. In due course, this court rendered an "Opinion" dated January 11, 1984 (which opinion is incorporated herein by reference). Several of the creditors, who had opposed the compromise, appealed and the United States District Court handed down an order on July 31, 1984. That order concluded that the case be remanded "for further consideration and additional findings and conclusions on the issue of the legality of the transfer by Emerald Oil Company of its one-eighth (⅛) working interest in the Williams B # 1 Well to David S. Bennett". In compliance with that order, this court has held the mandated evidentiary hearing, and for the reasons expressed herein, the compromise agreement is again approved.

In its opinion of January 11, 1984, this court stated with some specificity the general facts giving rise to the three pieces of litigation, and does specifically adopt that opinion in connection with this opinion. In addition to this, this court is mindful of the fact that the United States District Court requested additional findings on just one of those cases. It is important to note, however, that the compromise agreement tendered to this court involves not one, nor two, but three adversary proceedings and the compromise agreement affects all three. As was indicated by the trustee at the original hearing, and amplified by counsel for Mrs. Bennett at the most recent hearing, the legal issues, complexity and chance of successful litigation varies from case to case in each of the three contested matters. Both the trustee and Mrs. Bennett were adamant in insisting that the compromise agreement take into consideration all three cases, and therefore, this court, in viewing the best interests of the estate and of the creditors, must of necessity, recognize that the trustee has a much less substantial chance of success in litigation in the two matters not referred to by

the District Court than it does in the Williams B # 1 litigation.

At the outset, it is important for this court to note that it has not been called upon to make any final determinations of fact or conclusions of law with respect to this litigation. After all, the court has before it a compromise agreement and the purpose for its receipt of evidence is to substantiate whether or not the compromise is "fair and equitable". Although much of the evidence presented would also have been necessary for trial on the merits, the court is aware of the purpose for which it is presented here and that it does not attempt to represent the "whole case" of either side. Basically, each of the parties in this instance produced only the most central (or "gut") witnesses and evidence supporting their general positions. Should this matter be tried on the merits, this court is mindful of the fact that each of the parties would produce witnesses and evidence in ever increasing concentric circles from the central facts which evidence would tend to support, affirm, or contradict one position or another. Still the record here as it presently stands already occupies in terms of sheer volume of paper generated a space that dwarfs by comparison the records of most other similar adversary proceedings when fully litigated. The court is convinced, given the implicit technical and factual complexity involved and given the obvious litigious propensities of the parties that a full-blown trial of this matter would undoubtedly require a very long and costly effort. Further, in the end, it is an effort which would likely prove economically unsatisfactory to everyone. The trial itself could predictably consume several days of the court's time and would require illicitation of testimony from numerous additional witnesses, both factual and technical. Ironically, I suspect that ultimately this court would be in no better position than it already is to decide the case. Yet without all of this type of evidence, without giving each side a fair opportunity to its day in court—without the total effort, I simply could not make a final determination which would end the contro-versy. This in no way should be seen as a criticism of the district court's decision to remand this matter for further evidence and findings; that decision is soundly premised upon the well-established mandates of the Supreme Court and Fifth Circuit cases. Those cases are aimed at insuring that the trustee does not unwisely bargain away significant rights of the estate and its creditors, which is a laudable purpose. As a practical matter, however, one wonders about the wisdom of a judicial policy which requires a voluntary compromise to be litigated almost as fully as if the matter were brought to trial. The policy not only ignores many utilitarian considerations normally present in negotiations leading to amicable resolution of legal disputes, but also seems to run counter to the spirit of the Code which in general places a high premium on the trustee's discretion concerning matters of administration. Although judicial scrutiny is desirable and indeed demanded by the Code, the present "articulable facts" standard imposed by these cases, in my own opinion, goes far beyond the codal intent and seriously threatens the compromise process so encouraged by other segments of the judicial system. Nevertheless, such is the present state of the law in this area and the best that can be hoped for is that eventually the higher courts will see fit to re-examine this standard.

Returning to the matter at hand I am now satisfied that the mandate regarding approval of compromise has been met and that I have received sufficient evidence in this matter to adequately judge whether or not the proposed compromise is "fair and equitable". During the most recent hearing, in addition to the numerous documents presented the court heard a wealth of testimony regarding the history of the debtor and how it became involved in the drilling of the "Williams B # 1" well. Additionally, both sides offered extensive expert testimony aimed at placing a value upon the well and the debtor's potential rights in the well during the various stages of drilling and completion. This was all intended to prove

or to disprove Mrs. Bennett's contention that at the time of the subject assignment, given the uncertainties then existing, fair consideration was paid for the rights assigned. Stated otherwise, the central question to be answered is, at the time the assignment to Mrs. Bennett became perfected was she in effect buying "a pig in a poke" or was she obtaining a very valuable and proven mineral right at far below its known market value.

Regarding the facts leading up to the instant transaction, I find them to be as follows: As the result of extensive negotiations between the debtor and Dow Chemical Company, Emerald was to receive a fractional working interest to a group of leases owned by Dow as part of a complicated package allowing Emerald to drill a well on a turnkey basis. Subsequently, Emerald received a letter agreement from Dow dated March 22, 1979 whereby Dow agreed to sell Emerald a one-fourth ($\frac{1}{4}$) working interest in the leases for $50,000.00 to be paid within thirty (30) days. The letter expressed Dow's intent to drill a well to a depth of 17,000 feet or a depth sufficient to test the 16,900 foot sand. The drilling operations were to be governed by the terms of a joint operating agreement. Later Emerald received the operating agreement which is dated March 22, 1979. On April 4, 1979 Emerald accepted the Dow letter and on April 5, 1979, Emerald paid Dow $50,000.00 in exchange for the one-fourth ($\frac{1}{4}$) working interest. Thereafter, Dow executed a formal assignment of the interest to Emerald which was recorded in the records of St. Martin Parish. Emerald, for its part, executed the operating agreement with Dow for the drilling of the well as described in the letter agreement. The operating agreement was in standard form and it, inter alia, obligates Emerald to assume its proportionate share of the cost and expenses to be incurred in drilling the well. Later, on May 8, 1979, Emerald executed a contract to drill the well on a turnkey basis for $1,810,000.00, to a depth of 17,000 feet. The contract was accepted by Dow on September 14, 1979 and the well was spudded on October 18, 1979.

Numerous problems were subsequently encountered. In fact, by the time the contract depth was finally reached and the necessary steps were taken to turn operations back over to Dow, 14 days more than originally anticipated had been consumed and the cost had been increased by approximately 18%. The problems did not, however, end there and in fact matters took a turn for the worse. Within a day or so after completion of the turnkey contract, Dow made a decision to deepen the well. This meant that a liner had to be set in the hole, an operation normally requiring approximately six days and that ultimately took twenty-nine days. When this was finally done on January 30, 1980, the total cost had risen to $2,856,567.00. At around this same time problems were encountered with gas incursion which became difficult to control and threatened to cause a blowout and the total loss of the well. If that were not enough by the beginning of February the pipe got stuck in the hole, requiring a costly, dangerous and ultimately time consuming fishing operation. By February 5, 1980, when fishing began, the total costs were pegged at $2,951,473.00, by February 8, 1980 they had increased to $3,015,573.00. The fishing operation did not go smoothly, numerous set backs were encountered and, due to its dangerous nature, the well could have been lost at anytime during the processes. Additionally, these problems not only halted the deepening process but also prevented possible completion in the zones already encountered. On February 13, 1980 a crisis point was reached and the well appeared to be in danger of eminent blowout. The decision was made to shut in the well in order to get it under control. At this point the total cost was placed at $3,096,940.00. By mid-month the well was brought under control and the fishing process resumed. On February 21, 1980, the day the formal assignment to Mrs. Bennett was signed, the fishing operations were continuing and were still above the point from which completion later occurred. On that date the total costs were at $3,292,200.00 and Mrs. Bennett's one-eighth ($\frac{1}{8}$)

share of losses, assuming the validity of the assignment, would have been approximately $411,000.00. On February 25, 1980, the day the assignment was filed of record, although some progress had been made, fishing continued with the objective sand still covered up, and costs were being incurred at around $18,000.00 per day. By March 5, 1980 the process was continuing and the costs had reached a staggering $3,637,197.00. It was not, in fact, until March 12, 1980 that the objective sand was once again uncovered. At that point a decision was made to abandon the lower part of the hole and to begin completion at around the 16,800 foot objective. By the end of completion and testing on March 26, 1980 the total costs were placed at $4,484,-934.00 with Mrs. Bennett's share equalling approximately $560,616.00.

Regarding the assignment to Mrs. Bennett, the initial transaction took place via a letter agreement dated March 26, 1979 and signed and accepted by Mrs. Bennett on April 9, 1979. According to its terms, for $100.00 and O.V.C. Emerald was to assign to Mrs. Bennett one-half of its rights obtained under the previous Dow assignment. Mrs. Bennett would also be responsible for one-half of Emerald's obligations, including the obligation to pay costs and expenses under the Dow assignment. This agreement was later formalized and perfected by the Act of Assignment which was signed on February 21, 1980 and recorded in the public conveyance records on February 23, 1980.

The basic theory of the trustee in the instant litigation is that the transaction in question should be set aside as a fraudulent conveyance which occurred less than one year prior to bankruptcy. In support of his contention, the trustee has alleged that inadequate consideration was paid for the transfer and that the estate did not realize full value for that transfer. An initial hurdle which must be overcome by the trustee is that this transaction occurred less than one year prior to the bankruptcy. In order to clear that hurdle, the trustee has adopted the position, both in his pleadings and in his statements in front of this

court, that the operative date for the transfer is February 23, 1980, the date upon which the formal assignment from Emerald Oil Company to David Bennett was filed of record in the conveyance records of the appropriate parish. Mrs. Bennett, however, makes a very strong case that she had become obligated for her working interest share (including all expenses and liabilities attended thereto) as early as April 9, 1979, upon her execution of a written letter agreement to Emerald Oil Company confirming her obligation to purchase the interest. This date is in excess of one year prior to the Emerald Oil Company bankruptcy. Additionally, substantial evidence was and can be adduced that it is a custom and practice of the oil industry in Louisiana not to file an assignment of public record until such time as the well has been successfully drilled (and in some occasions not until it has been successfully completed). This court has handed down rulings in situations similar to this in which it has confirmed the obligation of a debtor to transfer an assignment in an oil, gas or mineral lease even after the filing of bankruptcy, where there was no written contract for the same, and further, where there was no written contract filed of record, based upon the customs and practices of the industry. Thus, there is a substantial doubt whether or not this case could even be maintained.

Assuming, for the moment, that the trustee would succeed and could maintain his case, then this court is convinced that Mr. Jeter, on behalf of the objecting creditors, has presented the core of the most substantial case which could be made against Mrs. Bennett. In viewing all of the evidence which was produced by the objecting creditors, it becomes obvious what the central theory or theme of their evidence is: that the books and records of Emerald Oil Company, together with the facts and circumstances surrounding the drilling of the well, lead to the conclusion that Emerald Oil Company and Mrs. Bennett were acting in concert so as to either: (1) hide her ownership interest in the Williams B #1

Well until such time as it was obvious that it was a productive well capable of making substantial sums of money for her, or (2) not claim any interest in the Williams B # 1 Well until such time as it was proven productive and valuable.

In order to substantiate its burden in proving the same, the objecting creditors presented a voluminous documentary case in which they attempted, primarily through the testimony of Mr. Wilson, to cast doubt and suspicion on the books, records, and documents of Emerald Oil Company. Although that evidence does lead to occasional discrepancies in the books and records, taken as a whole that evidence falls woefully short of convincing this court that a prima facie case can be made of any fraud or wrongdoing on the part of Mrs. Bennett or Emerald Oil Company. For every instance in which that evidence tends to imply some wrongdoing, that evidence can be countered either as a misinterpretation of the same, or alternatively a good faith mistake which occurred in an extremely busy and obviously understaffed corporate operation. More importantly, the countervailing evidence produced by the Bennetts shows that the assignment to Mrs. Bennett was filed of public record (and at that time, certainly exposed to public view) at a time in which the well in question was in extremely serious trouble and there existed a distinct possibility of loss of the entire investment and much more. Taken as a whole, the evidence presented in this case seesaws back and forth from one side to the other and convinces this court that there is no clear cut opportunity for the trustee to be successful.

For example, counsel for the opposing creditors placed Mr. Wayne Wilson, a CPA, on the stand and had him review the records of Emerald Oil Company. One of the facts that counsel attempted to show was, that although there was an invoice to Mrs. David Bennett for a quarter of a million dollars for her ownership obligations in the Williams B # 1 Well, that invoice was not filed of record in their regular invoice file. On the other hand, counsel for Mrs. Bennett elicited from Mr.

Wilson the fact that the invoice was found in the books and records of Emerald Oil Company and in fact, had been misfiled into the well record of Williams B # 1 file. Similarly, Mr. Wilson was able to find all other pertinent documents, although some were filed properly and some were misfiled.

Counsel for the opposing creditors placed Mr. Donald J. Timko, recognized by this court as an expert in formation evaluation, on the stand and had him review the well logs run on the Williams B # 1 Well on January 2, 1980. Counsel attempted to show that the value of the recoverable gas to the one-eighth (⅛) working interest of Mrs. Bennett may have ranged from between 2.1 million to 4.7 million dollars, based upon an assumption of a reservoir size of one hundred sixty (160) acres, a market price of gas of between $4.00 and $9.00 per MCF, and full recovery. On the other hand, counsel for Mrs. Bennett elicited from Mr. Timko the fact that his estimations were made in light of information obtained subsequent to the January 2, 1980 log, that the assumption of a one hundred sixty (160) acre reservoir is based upon the standard unit size in unitization proceedings, and that it is not common practice within the oil industry for estimations of reservoir size and recoverable gas reserves to be made upon the analysis of a single well log as was done by Mr. Timko for the purposes of this hearing. Counsel for Mrs. Bennett also placed on the stand Mr. Sam Bennett, recognized by the court as an expert in geology and petroleum engineering, who testified that it is not standard procedure within the oil industry to make calculations as to recoverable reserves of gas based upon a single well log, that such estimations would not be reliable and that, in fact, he did not make such calculations, nor have any been made for him. Mr. Bennett's testimony was for the most part corroborated by the testimony of Mr. Craig, also an expert in this field and who was called by the objecting creditors.

As another example, counsel for the opposing creditors elicited testimony from

Mr. Timko and Mr. Wilson in an attempt to show that Mrs. Bennett's one-eighth (⅛) interest had a considerable market value on February 21, 1980 and that she did not pay fair value for her one-eighth (⅛) interest in the Williams B # 1 Well. Counsel for Mrs. Bennett introduced into evidence Exhibit "M–4", the daily drilling reports on the Williams B # 1 Well. These reports indicated that on February 21, 1980, the date on which a formal assignment agreement was executed, the total well cost for the Williams B # 1 Well was $3,292,200.00. On that date, expenses continued to be incurred at a very rapid rate, as there were "fish" in the well hole and there was the very real possibility that the well would be lost. Mrs. Bennett's one-eighth (⅛) working interest share of the expenses as of February 21, 1980 was $411,525.00. Counsel for Mrs. Bennett elicited testimony from Mr. Bennett that, assuming Mrs. Bennett had a real choice of whether to accept or reject the formal assignment on February 21, 1980, he would have clearly advised Mrs. Bennett not to accept the assignment in consideration of the expenses incurred to date and the perilous condition of the well. Mr. Bennett also testified that, considering the condition of the well on February 21, 1980, Mrs. Bennett could not have sold and no reasonable business man would have purchased Mrs. Bennett's one-eighth (⅛) interest in the Williams B # 1 Well for the price of $411,000.00, Mrs. Bennett's share of the total well cost on February 21, 1980.

Once again, I find the testimony given by the third expert, Mr. Craig, to be largely corroborative of the testimony supplied by Mr. Bennett. Interestingly, as stated, Mr. Craig was called by the objecting creditors to testify regarding the value of the ⅛ interest assigned to Mrs. Bennett. This testimony was based on an earlier report he had done at the request of Mr. Bennett. Using the figures from that report he testified that the interest had an estimated after tax future income projection of $3,187,900.00. This would have indeed shown that Mrs. Bennett obtained quite a bargain, assuming the same information were available to her at the time of the assignment.

Mr. Craig, in later testimony however, went on to explain that his report was based upon information available to him as of April, 1980, notably well after the assignment. Further, he stated that both his study and that of Mr. Timko were what is termed a "volumetric estimate", which in his opinion was highly speculative at best. He went on to indicate that, even as of April, 1980, when a good deal more was known than at the time of the assignment and a good deal more was known than the information upon which the Timko report was based, even at that late date with nothing more than a volumetric estimate to go on, a good deal of risk remained that the entire project might fail. Accordingly, by his own emphatic admission, Mr. Craig would have given very little weight to his own estimate. I find Mr. Craig's testimony to be highly credible and highly supportive of Mr. Bennett's version of what transpired and what was truly known at the time of perfection. Further and keeping in mind that there is no witness "voucher" rule under the Federal rules of evidence, I nevertheless feel that some weight must be given to the fact that this witness was called by the objecting creditors, without the hint of hostility or bias to give favorable testimony on their behalf.

Accordingly, even giving the trustee (or here the objecting creditors) the benefit of the doubt and assuming that the transaction remained vulnerable until the date of perfection, on or about February 23, 1980, his chances of success would not be greatly increased. Indeed I find that given the risk shown to exist at that time he would face an extreme if not impossible task of demonstrating that adequate and fair consideration was not paid. Accordingly, and for all of the reasons stated, I find that the compromise agreement reached between the trustee and Mrs. Bennett is fair and equitable and shall once again be approved.